| | | |
|---|---|---|
| | AUSA:  John K. Neal | Telephone:  (313) 226-9644 |
| AO 91 (Rev. 11/11)  Criminal Complaint | Special Agent:   Lynn Rademacher-Gault | Telephone:  (743) 692-7651 |

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

United States of America
v.
Zaccheo Giovanni Pamio

> Case: 2:17-mj-30330
> Assigned To : Unassigned
> Assign. Date : 7/6/2017
> Description: CMP USA v. PAMIO (SO)

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____2006 to November 2015_____ in the county of _____Oakland_____ in the ____Eastern____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1343 | Wire Fraud |
| 42 U.S.C. § 7413(c)(2)(A) | Clean Air Act False Statement |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Lynn Rademacher-Gault
Printed name and title

Sworn to before me and signed in my presence.

Date:  July 6, 2017_____

_____
Judge's signature

City and state:  Detroit, MI_____

David R. Grand, U.S. Magistrate Judge
Printed name and title

## **AFFIDAVIT**

I, Lynn Rademacher-Gault, being first duly sworn, hereby declare and state as follows:

## **INTRODUCTION**

1.    I am a federal law enforcement officer of the United States authorized to conduct investigations and make arrests.

2.    I am a Special Agent (SA) with the United States Environmental Protection Agency (EPA), Criminal Investigation Division, assigned to the Detroit, Michigan, Resident Office.  I have been employed as a Special Agent with the EPA since February 2002.  Upon becoming a Special Agent with the EPA, I completed sixteen weeks of intensive training at the Federal Law Enforcement Training Center, Glynco, Georgia.  This training included instruction in search and seizure law and execution of search warrants, as well as extensive training in environmental law, including the Clean Air Act, codified at Title 42, United States Code, Sections 7412 and 7413, and its related regulations.

3.    As a Special Agent, I have participated in various investigations and prosecutions pertaining to conspiracy to defraud the United States, wire fraud, and Clean Air Act violations, including violations of Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States and Conspiracy to Commit an Offense Against the United States); Title 18, United States Code, Section 1343

(Wire Fraud); and Title 42, United States Code, Section 7413 (Clean Air Act violation). I have participated in investigations relating to violations of the environmental criminal statutes and have participated in the execution of numerous search warrants.

4.    I am investigating a scheme perpetrated by current and former employees of Volkswagen AG ("VW AG") and its subsidiaries, including Volkswagen Group of America ("VWGoA"), Audi AG ("Audi") and affiliates (collectively "VW") and others to impair and impede the lawful functions of the EPA, defraud U.S. customers of VW's diesel vehicles, and violate the Clean Air Act.  Specifically, from in or about 2006 until at least in or about 2015, VW falsely represented to the EPA and the California Air Resource Board ("CARB") (together with the EPA, "U.S. regulators") and its U.S. customers that its diesel-engine vehicles met applicable U.S. emissions standards and were otherwise "clean diesel," when in fact they were not.  Deceiving U.S. regulators allowed VW to sell vehicles in the United States even though they emitted harmful toxins into the environment in violation of the Clean Air Act.

## PURPOSE OF AFFIDAVIT

5.    This affidavit is made in support of a criminal complaint, establishing probable cause for the arrest of ZACCHEO GIOVANNI PAMIO for knowingly

2

participating in a conspiracy which lasted from in or about 2006 to at least in or about November 2015, in the Eastern District of Michigan and elsewhere, to: (1) defraud the United States by impairing and impeding the lawful functions of the EPA, an agency of the federal government, contrary to 18 U.S.C. § 371; (2) defraud VW customers using interstate wires, contrary to 18 U.S.C. § 1343; and (3) violate the Clean Air Act by making a material statement, representation, or certification in, or omit material information from, any notice, application, record, report, plan or other document required pursuant to the Clean Air Act to be filed or maintained (whether with respect to the requirements imposed by the Administrator or by a State), contrary to 42 U.S.C. § 7413(c)(2)(A); all in violation of 18 U.S.C. § 371.  PAMIO is also believed to have committed violations, or aided and abetted in committing violations of, the wire fraud statute, 18 U.S.C. § 1343, and the Clean Air Act, 42 U.S.C. § 7413(c)(2)(A).

6.     As is more fully described below, PAMIO is an employee of Audi who, from in or about 2002 until in or about November 2015, was the head of Thermodynamics within Audi's Diesel Engine Development Department in Neckarsulm, Germany.  From in or about 2006 until in or about November 2015, PAMIO led a team of engineers responsible for designing emissions control systems to meet emissions standards, including for nitrogen oxides ("NOx"), for

diesel vehicles in the United States.  PAMIO and his co-conspirators, however,

realized they could not calibrate a diesel engine that would meet NOx emissions

standards within the design constraints imposed by other departments at the

company.  In order to nevertheless market and sell vehicles with the Audi diesel

engine in the United States, PAMIO and his co-conspirators directed Audi

employees to design and implement software functions to cheat the standard U.S.

emissions tests, and then deliberately failed to disclose the software functions, and

misrepresented, and caused to be misrepresented, to the regulators and U.S.

customers, that the vehicles complied with U.S. NOx emissions standards, when

they knew the vehicles did not.

      7.    The basis of knowledge for the facts contained herein is my personal

observations, my training and experience, documents and records that were

collected and reviewed in the course of this investigation, information that was

obtained from interviewed witnesses, and information gathered by other agents of

EPA-CID and the Federal Bureau of Investigation.  Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in

substance and in part only.  Many of the documents collected in this case and cited

herein were originally written in German, and while such German-language

documents have been translated into English, such translations are not official, and the excerpts cited herein contain unofficial translations.

8.    For purposes of this affidavit, I am not including every fact known to me or other SAs with FBI and EPA-CID as part of this investigation.  This affidavit is intended to show merely that there is sufficient probable cause for the charge and arrest of PAMIO for violations of 18 U.S.C. § 371, 18 U.S.C. § 1343, and 42 U.S.C. § 7413(c)(2)(A).

## BACKGROUND

9.    The Clean Air Act prohibited manufacturers of new motor vehicles from selling, offering for sale, introducing or delivering for introduction into commerce, or importing (or causing the foregoing with respect to) any new motor vehicle unless the vehicle or engine complied with emissions standards, including NOx emissions standards, and was issued an EPA certificate of conformity as required by the Clean Air Act and federal regulations implementing the Clean Air Act. *See* 42 U.S.C. § 7522(a)(1).

10.   To obtain a certificate of conformity, a manufacturer was required to submit an application to the EPA for each model year ("MY") and for each test group of vehicles that it intended to sell in the United States.  The application was required to be in writing, and to be signed by an authorized representative of the manufacturer. The application was required to include the results of testing done

5

pursuant to the published Federal Test Procedures that measure NOx emissions, and to contain descriptions of the engine, emissions control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") installed in the vehicle.  *See* 40 C.F.R. § 86.

11.   An AECD was defined as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."  The manufacturer was also required to include a justification for each AECD.  If the EPA, in reviewing the application for a certificate of conformity, determined that the AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and that (1) it was not substantially included in the Federal Test Procedure, (2) the need for the AECD was not justified for protection of the vehicle against damage or accident, or (3) it went beyond the requirements of engine starting, the AECD was considered a "defeat device."  *See* 40 C.F.R. § 86.1803-01.

12.   The EPA would not certify motor vehicles equipped with defeat devices.  Manufacturers could not sell motor vehicles in the United States without a certificate of conformity from the EPA.

13.   CARB issued its own certificates, called executive orders, for the sale of motor vehicles in the State of California.  To obtain such a certificate, the manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of the EPA.

14.   As part of the application for a certification process, manufacturers often worked in parallel with the EPA and CARB.  To obtain a certificate of conformity from the EPA, manufacturers were also required to demonstrate that the light-duty vehicles were equipped with an on-board diagnostic ("OBD") system capable of monitoring all emissions-related systems or components. Manufacturers could demonstrate compliance with California OBD standards in order to meet federal requirements.  CARB reviewed applications from manufacturers to determine whether their OBD systems were in compliance with California OBD standards, and CARB's conclusion would be included in the application the manufacturer submitted to the EPA.

## Relevant Companies

15.   Volkswagen AG ("VW AG") was a motor vehicle manufacturer based in Wolfsburg, Germany.

16.   Audi AG ("Audi") was a motor vehicle manufacturer based in Ingolstadt, Germany, and a subsidiary approximately 99% owned by VW AG.

17.   Volkswagen Group of America, Inc. ("VW GOA") was a wholly-owned subsidiary of VW AG based in Herndon, Virginia.

18.   VW AG, Audi AG, and VW GOA are collectively referred to herein as "VW."

## Relevant Individuals

19.   Cooperating Witness 1 ("CW1") is an Audi employee who works in Audi's Diesel Engine Development Department.  CW1 has agreed to cooperate with the government's investigation in exchange for an agreement that the government will not prosecute CW1 in the United States.  Based on a comparison of CW1's statements with those of other witnesses and with available records, I find CW1's statements to be reliable.

20.   PAMIO is an employee of Audi who, from in or about 2002 until in or about November 2015, was the head of Thermodynamics within Audi's Diesel Engine Development Department.  From in or about 2006 until in or about

November 2015, PAMIO led a team of engineers responsible for designing emissions control systems to meet emissions standards for diesel vehicles in the United States.

### Audi Diesel Vehicles Sold in the United States

21.    VW sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported into the United States, or caused the foregoing actions (collectively, "sold in the United States") the following vehicles containing 3.0 liter diesel engines designed and manufactured by Audi ("Subject Vehicles"):

      a.    MY 2009-2016 VW Touareg;

      b.    MY 2009-2015 Audi Q7;

      c.    MY 2013-2016 Porsche Cayenne;

      d.    MY 2014-2016 Audi A6 Quattro;

      e.    MY 2014-2016 Audi A7 Quattro;

      f.    MY 2014-2016 Audi A8L;

      g.    MY 2014-2016 Audi Q5; and

      h.    MY 2016 Porsche Macan.

22.    VW GOA's Engineering and Environmental Office ("EEO") was located in Auburn Hills, Michigan, in the Eastern District of Michigan.  Among

other things, EEO prepared and submitted applications (the "Applications") for a certificate of conformity and an executive order (collectively, "Certificates") to the EPA and CARB to obtain authorization to sell Audi vehicles in the United States, including each of the Subject Vehicles.  VW GOA's Test Center California, located in Oxnard, California, performed testing related to the Subject Vehicles.

23.    Audi employees developed the engines for the Subject Vehicles.

24.    The Applications to the EPA were accompanied by the following signed statement by a VW representative:

> The Volkswagen Group states that any element of design, system, or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief, cause the emission into the ambient air of pollutants in the operation of its motor vehicles or motor vehicle engines which cause or contribute to an unreasonable risk to public health or welfare except as specifically permitted by the standards prescribed under section 202 of the Clean Air Act. The Volkswagen Group further states that any element of design, system, or emission control device installed or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines, for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief, cause or contribute to an unreasonable risk to public safety.
>
> . . .
>
> All vehicles have been tested in accordance with good engineering practice to ascertain that such test vehicles meet the

requirement of this section for the useful life of the vehicle.

25.    Based on the representations made by VW employees in the
Applications for the Subject Vehicles, EPA and CARB issued Certificates for these
vehicles, allowing the Subject Vehicles to be sold in the United States.

26.   VW represented to its U.S. customers, U.S. dealers, U.S. regulators,
and others that the Subject Vehicles met the new and stricter U.S. emissions
standards.  Further, VW designed a specific marketing campaign to market these
vehicles to U.S. customers as "clean diesel" vehicles.

## STATEMENT OF PROBABLE CAUSE

27.   As further described below, there is probable cause to believe that
from at least in or about 2006 and continuing through at least November 2015, in
Oakland County, within the Eastern District of Michigan, and elsewhere, defendant
ZACCHEO GIOVANNI PAMIO, and others, did knowingly, intentionally, and
willfully combine, conspire, and confederate and did agree to:  (i) defraud the
United States by impairing, impeding, obstructing, and defeating a lawful function
of the federal government, that is, the EPA's function of implementing and
enforcing emissions standards for air pollutants for new motor vehicles under the
Clean Air Act, by deceitful or dishonest means, in violation of 18 U.S.C. § 371; (ii)
commit wire fraud, that is, knowingly, willfully, and with the intent to defraud,

11

having devised and intending to devise a scheme and artifice to defraud and to

obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, transmit and cause to be transmitted by means of

wire, radio, and television communication, writings, signs, signals, pictures, and

sounds in interstate and foreign commerce for the purpose of executing such

scheme and artifice in violation of 18 U.S.C. § 1343; and (iii) violate the Clean Air

Act, by making and causing to be made, false material statements, representations,

and certifications in, and omitting and causing to be omitted material information

from, notices, applications, records, reports, plans, and other documents required

pursuant to the Clean Air Act to be filed or maintained, in violation of 42 U.S.C. §

7413(c)(2)(A); and committed at least one overt act in furtherance of the

conspiracy, all in violation of 18 U.S.C. § 371.  In addition, there is probable cause

to believe that from at least in or about 2011 and continuing through at least

November 2015, in Oakland County, within the Eastern District of Michigan, and

elsewhere, defendant ZACCHEO GIOVANNI PAMIO: (1) committed wire fraud,

that is, knowingly, willfully, and with the intent to defraud, having devised and

intending to devise a scheme and artifice to defraud and to obtain money and

property by means of materially false and fraudulent pretenses, representations,

and promises, transmit and cause to be transmitted by means of wire, radio, and

television communication, writings, signs, signals, pictures, and sounds in

interstate and foreign commerce for the purpose of executing such scheme and

artifice in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2; and (2) violated the

Clean Air Act, by making and causing to be made, false material statements,

representations, and certifications in, and omitting and causing to be omitted

material information from, notices, applications, records, reports, plans, and other

documents required pursuant to the Clean Air Act to be filed or maintained, in

violation of 42 U.S.C. § 7413(c)(2)(A) and 18 U.S.C. § 2.

### A.    The Origin and Implementation of the Defeat Devices

28.    According to CW1, and as corroborated by contemporaneous

documentation, beginning in or about 2006, Audi was designing the new 3.0 liter

diesel engine that would be the cornerstone of a new project to sell passenger

diesel vehicles in the United States.  Selling diesel vehicles in the U.S. market was

an important strategic goal for Audi.  The 3.0 liter diesel engine was ultimately

placed in certain VW, Audi, and Porsche diesel vehicles sold in the United States

for MY09 through MY16.

29.    According to CW1, and as corroborated by contemporaneous

documentation, PAMIO and his co-conspirators, however, realized they could not

calibrate a diesel engine that would meet the stricter NOx emissions standards that

13

would become effective in 2007 within the design constraints imposed by other departments at the company.

30.     According to CW1, and as corroborated by contemporaneous documentation, the proposed Audi 3.0 liter diesel engine employed Selective Catalytic Reduction ("SCR") technology to reduce NOx emissions.  As part of the SCR technology, exhaust stream emissions were dosed with a mist of a urea substance, commonly known as "AdBlue," which converted NOx into nitrogen, water, and small amounts of carbon dioxide.  The initial SCR design required a certain amount of AdBlue be stored onboard the vehicle to reduce NOx emissions to legal limits and reach a 10,000 mile service interval for refilling.  The requisite tank size for onboard storage was believed by certain Audi employees to interfere with features considered to be attractive to customers, such as a high-end sound system.

31.     According to CW1, and as corroborated by contemporaneous documentation, as a result, Audi employees, acting at the direction of PAMIO and his co-conspirators, designed and implemented software functions, described below as a "dosing strategy" and a "warm-up function," to cheat the standard U.S. emissions tests.  These functions constituted defeat devices.

14

32.     According to CW1, and as corroborated by contemporaneous documentation, while designing and implementing the defeat devices, PAMIO and his co-conspirators knew that U.S. regulators would measure Audi's diesel vehicles' emissions through standard tests with specific, published drive cycles. Audi employees designed the Audi defeat devices to recognize whether the vehicle was undergoing standard U.S. emissions testing on a dynamometer (or "dyno") or whether the vehicle was being driven on the road. If the vehicle's software detected driving test conditions, the vehicle performed in one mode, which satisfied U.S. NOx emissions standards. If the software detected that the vehicle was not being tested, it operated in a different mode, in which the vehicle's emissions control systems were reduced substantially, causing the vehicle to emit substantially elevated levels of NOx.

33.     According to CW1, and as corroborated by contemporaneous documentation, Audi employees, acting at the direction of PAMIO and his co-conspirators, designed and implemented a defeat device for vehicles to be sold in the United States that PAMIO and his co-conspirators referred to as the "dosing strategy." The dosing strategy varied injection levels of AdBlue into the exhaust system depending on whether the vehicle was being tested. During regular

15

driving, the vehicle used substantially less AdBlue in order to limit consumption, and had correspondingly higher NOx emissions.

34.     According to CW1, and as corroborated by contemporaneous documentation, Audi employees, acting at the direction of PAMIO and his co-conspirators, also implemented a defeat device that they referred to as the "warm-up function."  During test cycles, this defeat device used the recirculation of exhaust gas to warm the SCR catalyst, thereby further optimizing AdBlue use and allowing the vehicle to stay within U.S. NOx emission limits.  However, when the defeat device detected that the vehicle was on the road, the engine switched to "customer mode," reducing the recirculation of exhaust gas, and causing NOx emissions to spike.

35.     According to CW1, and as corroborated by contemporaneous documentation, starting with MY09 of Audi's new "clean diesel" engine through MY16, PAMIO and his co-conspirators, and others, then installed, and caused to be installed, the software to implement the defeat devices in the Subject Vehicles marketed and sold in the United States.

**B.     Certification of Audi Diesel Vehicles in the United States**

36.     According to CW1, and as corroborated by contemporaneous documentation, between in or around 2008 and 2015, Audi and VW employees

met with the EPA and CARB to seek the certifications required to sell the vehicles in the United States.  During these meetings, PAMIO and his co-conspirators deliberately failed to disclose the dosing strategy and warm-up function, and misrepresented, and caused to be misrepresented, to the EPA and CARB staff that the Subject Vehicles complied with U.S. NOx emissions standards, when they knew the vehicles did not.

37.     According to CW1, and as corroborated by contemporaneous documentation, also as part of the certification process for each new model year, PAMIO and his co-conspirators falsely and fraudulently certified, and caused to be certified, to the EPA and CARB that the Subject Vehicles met U.S. emissions standards and complied with the Clean Air Act.  PAMIO and his co-conspirators knew that if they had told the truth and disclosed the existence of the defeat devices, Audi would not have obtained the requisite Certificates for the Subject Vehicles.

**C.     Marketing of "Clean Diesel" Vehicles**

38.     According to CW1, and as corroborated by contemporaneous documentation, having obtained the necessary EPA and CARB Certificates, PAMIO and his co-conspirators marketed, and caused to be marketed, the Subject Vehicles to the U.S. public as "clean diesel," when they knew that these

17

representations made to U.S. customers were false, that the Subject Vehicles were not "clean," that Audi's diesel vehicles were intentionally designed to detect, evade, and defeat U.S. emissions standards, and that the Subject Vehicles were polluting the environment with NOx emissions well above U.S. emission limits.

**D.    The Concealment of the Defeat Devices**

39.    According to CW1, and as corroborated by contemporaneous documentation, in or around March 2014, certain Audi employees, including PAMIO, learned of the results of a third-party study undertaken into NOx emissions of certain tested vehicles, which identified substantial discrepancies between emission test results and real driving emissions ("RDE") for two of VW's 2.0 liter vehicles.  In communications and meetings with U.S. regulators, PAMIO and his co-conspirators concealed and caused Audi employees to conceal, the existence of the defeat devices in Audi 3.0 liter diesel vehicles.

**E.    Overt Acts in Furtherance of the Conspiracy**

40.    According to CW1, and as corroborated by contemporaneous documentation, Audi and VW employees engaged in numerous overt acts in furtherance of the conspiracy in the Eastern District of Michigan, including:  (i) meeting with U.S. regulators to obtain and maintain approval for VW diesel vehicles to be sold in the United States during which Audi and VW employees lied

18

to U.S. regulators and omitted material facts; (ii) submitting applications to U.S. regulators on behalf of VW to obtain authorization to sell diesel vehicles in the United States from VW's EEO office located in Auburn Hills, Michigan; and (iii) engaging in wire communications regarding the conspiracy, including by email and phone, between EEO's office in Auburn Hills, Michigan and Audi's offices in Germany.

41.     On or about January 23, 2008, Audi engineers who helped design the dosing strategy sent a presentation to senior Audi managers, including PAMIO, to warn that the dosing strategy constituted "cycle beating," which was "[h]ighly problematic in the US[]" because, among other things, it was an undisclosed AECD and possibly a defeat device, and could be discovered by the regulators.

42.     On or about July 4, 2008, PAMIO received advanced warning from an Audi employee responsible for certification that managers in the certification department had concluded the dosing strategy was "indefensible," because "[it] is a plain Defeat Device and is not certifiable."

43.     On or around March 23, 2009, to obtain certification, PAMIO caused VW employees to send CARB a letter affirmatively misrepresenting that there were no defeat devices in the MY09 vehicles.

44.     On or about September 27, 2013, an Audi manager in the

certifications department sent an email about approaching U.S. regulators to discuss the dosing strategy in Audi diesel vehicles. In a response to a senior Audi executive, PAMIO argued that disclosure was "too risky!"

45.     In or around October 31, 2013, PAMIO directed his team to prepare a presentation to a then-senior executive and member of Audi's brand management board, describing in detail the dosing strategy and the function's problematic characteristics. PAMIO participated in the preparation, including by reviewing and commenting on drafts. The Audi engineer who sent the email attaching the presentation, advised the recipients, which included PAMIO, to delete the email and attachment.

46.     On or about March 24, 2015, PAMIO and other Audi employees met with CARB in El Monte, California. PAMIO falsely indicated that the Audi 3.0 liter diesel vehicles did not have similar issues to the VW 2.0 liter diesel vehicles, and knowingly presented false and misleading information, which concealed the existence of the defeat devices, to obtain certification of the MY16 diesel vehicles.

47.     In or about November 2015, PAMIO and his co-conspirators directed a group of Audi engineers to omit key facts about the defeat devices from a presentation they prepared for U.S. regulators to address allegations of emissions cheating.

**F.      Specific Additional False Statements Under the Clean Air Act**

48.      On or about November 7, 2012, PAMIO knowingly omitted, and

caused to be omitted, the material fact of the installation of the defeat device in the

Application for the certificate of conformity submitted to the EPA pursuant to the

Clean Air Act for the 3.0 liter diesel MY 2012 VW Touareg, and knowingly and

falsely certified, and caused to be certified, that any element of design, system, or

emission control installed on or incorporated in such vehicles would not cause the

release of pollutants into the ambient air. In fact, as indicated above, PAMIO knew

that the defeat devices were installed on the MY 2012 VW Touareg vehicles and

that, because of those defeat devices, when not in the testing mode the vehicles

would release pollutants into the ambient air in violation of the standards set under

the Clean Air Act.

49.      On or about November 13, 2013, PAMIO knowingly omitted, and

caused to be omitted, the material fact of the installation of the defeat device in the

Application for the certificate of conformity submitted to the EPA pursuant to the

Clean Air Act for the 3.0 liter diesel MY 2013 Audi Q7, and knowingly and falsely

certified, and caused to be certified, that any element of design, system, or

emission control installed on or incorporated in such vehicles would not cause the

release of pollutants into the ambient air. In fact, as indicated above, PAMIO knew

that the defeat devices were installed on the 3.0 liter diesel MY 2013 Audi Q7

vehicles and that, because of those defeat devices, when not in the testing mode the

vehicles would release pollutants into the ambient air in violation of the standards

set under the Clean Air Act.

### G.   Wire Fraud

50.   On or about January 28, 2015, in furtherance of a scheme to defraud

VW's U.S. customers of the Subject Vehicles, PAMIO, in Germany, sent an email

to an EEO manager in Michigan, among others, discussing PAMIO's proposed

approach for an upcoming presentation to CARB concerning Subject Vehicles.

51.   On or about September 25, 2015, in furtherance of a scheme to

defraud VW's U.S. customers of the Subject Vehicles, PAMIO, in Germany, sent

an email to an EEO employee in Michigan to arrange a meeting with U.S.

regulators to address regulators' concerns about emissions testing results for the

Subject Vehicles.

### CONCLUSION

52.   The above facts establish probable cause to believe that from in or

about 2006 until at least November 2015, Audi and VW employees, including

ZACCHEO GIOVANNI PAMIO, and others conspired and unlawfully agreed

with each other to impair, impede, and obstruct a lawful function of the

government, that is EPA's function of issuing certificates of conformity for

compliant vehicles in order that the vehicles can be sold in the United States, by

deceitful or dishonest means; to defraud U.S. customers of VW diesel vehicles; to

violate the Clean Air Act; and committed at least one overt act in furtherance of the

conspiracy, all in violation of 18 U.S.C. § 371.  In addition, the above facts

establish probable cause to believe that from at least in or about 2011 and

continuing through at least November 2015, defendant ZACCHEO GIOVANNI

PAMIO: (1) committed wire fraud, that is, knowingly, willfully, and with the

intent to defraud, having devised and intending to devise a scheme and artifice to

defraud and to obtain money and property by means of materially false and

fraudulent pretenses, representations, and promises, transmit and cause to be

transmitted by means of wire, radio, and television communication, writings, signs,

signals, pictures, and sounds in interstate and foreign commerce for the purpose of

executing such scheme and artifice in violation of 18 U.S.C. § 1343 and 18 U.S.C.

§ 2; and (2) violated the Clean Air Act, by making and causing to be made, false

material statements, representations, and certifications in, and omitting and causing

to be omitted material information from, notices, applications, records, reports,

plans, and other documents required pursuant to the Clean Air Act to be filed or

maintained, in violation of 42 U.S.C. § 7413(c)(2)(A) and 18 U.S.C. § 2.

LYNN RADEMACHER-GAULT
Special Agent
Environmental Protection Agency


Subscribed to and Sworn before me
This 6th day of July 2017

HONORABLE DAVID R. GRAND
UNITED STATES MAGISTRATE JUDGE

24